Each side is going to have 20 minutes, and before we get started, I'm going to ask the appellants how they plan to divvy up their time. Good morning. Good morning. I'm Lisa Rasmussen, and I will be arguing for I think our proposal is 10 minutes, Mr. Kennedy for another 5 minutes, and then we would reserve 5 for combined rebuttal. Okay. I'm sorry. So Mr. Kennedy is going to get how much? Five minutes. Five. You'll start with 10 for you, and then 5 for rebuttal. Correct. Got it. Okay. Good morning. Okay. Good morning. May it please the Court. Excuse me. Before you start, would you put 10 minutes on the clock, please, for Ms. Rasmussen? There you go. Thanks. Thank you. Good morning. May it please the Court. Judge Gould, I'm going to try not to forget you on the video over there. No, that's okay. I am Lisa Rasmussen, and I represent DeAndre Patton in this litigation. This is two cases consolidated with three defendants. Mr. Kennedy represents Mr. Sangalang, and Mr. Brooklier represents Mr. Flores. Mr. Flores is only an appellant in the 163 case, the Stash House case. I first want to talk about, and Mr. Kennedy has planned on talking about the motion for new trials, so I'm going to focus on some different things. And the first thing I want to talk to you about is the denial of our expert. This case is similar to a host of other Stash House cases, and in almost every aspect, except that we have these unique issues of the denial of an expert and the denial of an adverse inference instruction. Our theory of the case was essentially denied by precluding our expert in this case. Our expert would have testified. In fact, he wasn't even allowed to tell the Court what the sum and substance of his testimony would have been. The district court didn't allow us to even proffer the proposed testimony, but what he would have testified to would be the concept of braggadocio, which is the. Wasn't that covered in the expert's report that the district court did review? In the – I'm sorry, in the report? Yes. The report was actually given to the government early on. It was technically work product. It had all kinds of opinions. And so the district court, when we got to the trial, said, well, I – the district court actually called him Rush Limbaugh. And I said – and he said, I think these are crazy opinions. And I said, but that's not what he's going to testify to, Your Honor. I said he's going to testify to braggadocio, to the policies of DOJ with reference to handling of informants, confidential informants, and with the policies of DOJ with regard to measures for ensuring that there is no entrapment. And he was well qualified to discuss all three of those issues. He could have also testified to the fact that the government enhanced the quantity for the purpose of enhancing the sentencing. And it – we weren't even allowed to present the expert outside the presence of the jury with regard – at, for example, at a 104 hearing so that the expert could explain his credentials and the sum and substance of his testimony. And the – Roberts. It's not clear why this would be the subject of expert testimony. Can you help me with that? Yes, absolutely. Because in the government's case, they presented agents, Agent McCarthy, Agent Zayas, Agent Gomez, who provided testimony in the context of a lay witness, but they provided testimony as if they were experts. They said, these are particularly dangerous operations. These are things that only certain types of people would do. These are blank, blank, blank. They provided testimony in a number of instances which we covered, and I think really specifically covered in the reply brief, that we had no opportunity to rebut. It was simply unrebutted testimony, which essentially deprived us of our theory of the defense and our theory of the case. What is the defense of braggadocio? The defense of braggadocio, it's a – what Michael Levine, the expert, would have explained is that when you put people in a certain situation, like these defendants believed that they were dealing with people who were associates of the hell's angels, then they want to convey the attitude and the idea and the concept that they are equally tough and that they are equally bad and that they can stand up to the friendship of these people that's constantly being tested over a period of a year. That's just a matter of expert – expertise? Well, it would be – what he would have testified to is that it is not uncommon for people with no criminal history to engage in braggadocio to make themselves seem worse than they are because that's the content and context of where they are with these undercover agents. Couldn't a jury, applying their own commonsensical, you know, gifts or what have you, in viewing the surveillance film, which I understand was extensive, couldn't they perhaps distinguish between, you know, somebody puffing and bragging as opposed to perhaps, you know, something more serious? Well, they could, except that the testimony from the agents, essentially acting as people who know and who do this all the time, i.e. as experts, was that only dangerous people would agree to do this. And it's simply not true. And our expert would have said a lot of people engage in that kind of puffery and bragging, but a lot of – there was no independent investigation ever done by the government in this case to ensure that these people had ever done any of these things that they were talking about. They didn't so much as bring a former gang field identification card for a single one of these defendants showing that they had ever objectively or that they had any documentation of gang membership even. I mean, there was no – so what you have are agents saying, oh, only dangerous people would agree to do this, and it's simply not true. And our expert would have explained that. But beyond that, our expert also would have explained that the DOJ has policies, policies for how you handle confidential informants, policies for what you do to ensure that there isn't entrapment. And none of that – we weren't allowed to present any of that, and it was just an outright denial of our ability to present the defense that we were presenting, which was that they were entrapped, that – and once we allege an entrapment defense, then the burden is on the government to prove beyond a reasonable doubt the elements that it has to prove. And by denying us the opportunity to put up someone who was a former law – for years, 24-plus years, former Federal law enforcement agent who could have spoken to these very issues and these necessary controls, we were denied, in effect, our right to present a defense. Kennedy, weren't you able to bring it out through cross-examination of these various government witnesses, agents, informants? No, because the testimony of the government agents was that only dangerous people would agree to do anything like this. That was their testimony. I mean, they deny – they deny in their testimony that there is such a thing as puffery. They deny that that exists. With regard to the – with regard to the snitch handling and the regulations, we tried to present, prior to trial at the evidentiary hearing and at trial, the regulations that we had obtained, which were written in 93. And I know that sounds really old, but apparently ATF only updates these things or any of the branches about every 10 years. So they admitted that what we didn't have was the most current iteration of their guidelines and that that was one generation behind what we had. But they wouldn't provide us their guidelines. They wouldn't provide us their policy, their current policy, so that we could cross-examine and say, well, you didn't do this and you didn't do this. So we were in this horrible position of them telling us, well, you can't use the old ones and we're not going to give you the new ones. And so there we were. And our expert would have, at a minimum, helped us with that. And he would have been able to explain that not only – in particular, that these are DOJ regulations. These aren't just ATF, that it applies to DEA, ATF, FBI. These are regulations that go along with informants and undercover reverse stings. This is what is typically done and this is the way it's done. And it wasn't done here. And without the proper materials, we were at a loss. I also wanted to talk to you about the refusal for – from the district court of us to have an adverse inference instruction. It's well documented in our case that we have destruction of DVDs, that they were non-rewritable, that there was no reason to destroy them, that they could have been maintained. This is interwoven throughout the trial. It's – with a well-preserved issue, it came – it was a huge subject of the evidentiary hearing that spanned 11 months and numerous hearings. As I understand it, they say they threw them out because they culled through hours and hours and hours of stuff and they only kept the material that was pertinent. They only kept the ones that they felt were important, which were the transactions they wanted to record. What would have been – what do you think would have been shown by these things that were tossed out? What would have been shown was corroborating evidence to my client's testimony at trial. My client testified that Bones, the informant, gave them drugs and asked them to take drugs to the agents at the shop, and they did it. And then when the agents left the shop, they went to Bones' tattoo bay and gave him the money that they had received from the agents. And what would that have proven? It would have established that it would have corroborated that Bones was the source of the drugs and that Bones got the money from the agents. Anybody dispute that? Well, I – That's the way the case was presented, wasn't it? The dispute comes from the cross-examination from the government of our client when he testified that that's what happened, and they essentially say, well, you know, you're the only one saying that. You have no evidence of that. I see you're – And I'm low on my time, so I will defer to Mr. Kennedy, and I will look forward to rebuttal. Thank you. Thank you. Good morning, Counsel, and Your Honors. Good morning. A new trial is appropriate because there's a Brady violation and newly discovered evidence. Three witnesses, Dabney, Lewis, and Tilley – Dabney could give testimony that Bones created crime rather than prevented crime by obtaining the guns that were in the Tattoo Shop, obtaining the drugs, and cutting the drugs, and having others deliver them, and then taking the money. This was corroborated by Tilley and by Lewis. Lewis testified that the two guns were purchased by Bones, that he then – Bones said, I'll lose my job at the Tattoo Shop, that Tilley then gave the weapons to the undercover agents, and that Bones profited from it. How does that exculpate your guys? It shows no predisposition, and it shows that the government induced. Because in an entrapment case, it's different. And it's different because it's an element of proof that the government has to prove beyond a reasonable doubt that the defendants are predisposed and they were not induced. And so with these three witnesses, of which the government knew of Dabney in December of 2009 and didn't tell counsel, with those witnesses, they could have assessed – the jury could have assessed where there's smoke, there's fire. And what Bones is doing is creating crime for his own profit. He's buying the gun, he's stealing the guns. The allegations here was that the guns were made illegal by Bones because he obliterated the serial numbers. The allegations here were that Bones cut the guns down. The defendants here had no felony convictions. So any possession of the guns outside of this obliteration of the serial number or the cutting down the guns was favorable evidence to the defense. That then was shown to be true that in 2009, Bones, Mr. Beckwith, pled the fifth to what he testified to in Las Vegas, what he did in Las Vegas. Everything about that investigation, he took the fifth to. That could have resulted in an entirely different trial, and that's why it's appropriate of the suppression of the Brady information. It was favorable. It was suppressed by the government. It need not be intentional. It can be inadvertently, and it prejudiced them because it's the government's burden to prove beyond a reasonable doubt predisposition and non-inducement. So if the jury came back and said, we think we have clear and convincing evidence, that's an acquittal. We think we have a preponderance of the evidence. That's an acquittal. And so entrapment is very, very different, and that's what the case law holds. And so we can look at the context of what was going on here. And when Bones pled the fifth, that made this case different than any other Stash case. I have looked through any of these cases to see where the confidential informant, who's the center of the investigation, takes the fifth as to his entire actions in Las Vegas under oath, and he did it when Dabney, Lewis, and Tilly gave testimony. We could have brought out at trial, on behalf of Mr. Sanglang, Mr. Patton, and Mr. Flores then, all of that evidence so that Bones would have been facing that. The district court, when we argued the new trial motion, said, well, I thought that Mr. Bones was kind of feckless, that he wasn't the boogeyman that everyone thought them to be. It was an act. Dabney, Lewis, and Tilly would have added credit to that. What question was asked of Bones in Texas to which he took the fifth? Had he ever committed a perjury in federal court was one of them. They asked specifics as to the guns with Patton. And the Court can look at that through 3992 to, I believe, 4019 in the excerpt of records, and he pled the fifth about 25 times. One question was, have you ever lied in federal court? I believe, let me find it here real quickly. Commit at page 4013, question, commit perjury before a federal court, plead the fifth. And that was in reference to the ongoing discussion about the Las Vegas investigation, the Dallas investigation, and he pleads the fifth about. So the follow-up question is then, okay, while you're working with the ACF in Las Vegas, I understand you helped bring about charges against the defendant, DeAndre Patton, for the sale of a firearm at Dee's Restaurant. Plead the fifth. Did you provide him the money to get that firearm? Plead, no, sir. You didn't. Let me make sure I understand that transaction. Were you at the restaurant? Plead the fifth. Where did the ATF agent hand you the money? Plead the fifth. And did you hand that money to Mr. Patton? Plead the fifth. I believe you answered previously that you did not hand him the money. Plead the fifth. So everything that was the essence of that investigation, he pled the fifth to. That's why it's a Brady violation. It's also- All right, counsel, Judge Gould has a question on that. Yes. When he gave that testimony, what was the timing of that, compared with the trial here? The two trials here were the 163 case was tried in March of 2010. The 140 case was tried in April of 2010. His testimony was in May of 2011. And the original allegation in a motion to dismiss, filed in Dallas, Texas, was, I believe, December of 2009, where the original allegations came to being. So there were six months' time where this information was known about Dabney, Lewis, and Tillman. I guess my question was, or in my mind was, if he testified and took the fifth after the trials here, how is that a Brady violation? It isn't in itself a Brady violation, but it gives context to the prejudice, because what he's testifying about involved the Dabney, Lewis, and Tilley testimony, which was known prior to trial. And so our defense was this was a corrupt informant. And so as to the prejudice, in terms of a reasonable probability, the fact that later he took the fifth is the final straw. It falls directly, more properly, under the newly discovered evidence prong of the new trial motion, where it is obviously new evidence. We were diligent in getting it. It is material. It's not simply cumulative or impeachment evidence, because it goes to the government's proof of predisposition or lack of inducement. And it would have the impact. This would be a completely different trial if we had that information to try the case here in 2014. Why it's important to the Brady violation is it goes to the prejudice prong in terms of what would happen. We now know what Bones was doing, because there's no way to look at two years later his pleading the fifth 25 times other than to make the inference that he lied when he testified in front of the jury in Las Vegas. Is the Brady violation that they knew at the time of the trial that he was testifying falsely and didn't set that straight, is that the Brady violation? It's part of it, but more importantly, they knew that Dabney had alleged in a formal pleading in Dallas, filed that Bones was doing the exact same thing that we had been arguing about for the outrageous government conduct motion for 11 to 13 months in Las Vegas. The same agents were his handlers in Dallas. He was still under contract. None of that information got back to us until after trial. And so we were denied witness Dabney. We were denied witness Lewis that could have been investigated and found out. We were denied witness Tilly. And so when those three people talked to the jury, then when Bones got up there, he couldn't play this feckless routine. It's very similar to a case that I tried, which we cite in the brief, Hugo Cruz Garcia, which Judge Kaczynski reversed when the government presented a witness like, oh, he couldn't have entrapped these people, he's not smart enough. That was one of the arguments in this trial about Bones. And then I was denied the opportunity to show that I had a detective, Big Mike, ready to testify about the seven times that their informant had done drug transactions with him, both in English and Spanish with pagers. So that conviction was reversed. This is very similar here. If the jury had heard from Dabney, Lewis, and Tilly, then they would have said, okay, where there's smoke, there's fire, there's something going on here. And if- Dabney, Lewis, and Tilly were defendants in the Texas case? Yes. It's not even clear they'd be available to testify, is it? They gave testimony. They had every reason. They gave testimony. In their case? In their case. Okay, there's no reason to believe they testified in your case. We would never have been able to do so because we didn't learn of their existence, even though the government knew it, until post-trial. Actually, after we learned, we provided transcripts of the testimony to them to use in their case, and they were willing to go in and testify under oath in the Texas case. I see you're out of time. Thank you, Mr. Kennedy. Thank you. By the way, for the record, let me just make sure we have Mr. How is it, Brooke? Could you spell that for me, please, Mr. Brookley? Could you spell it? Thanks. And you're here for Mr. Flores, right? Thank you. Alrighty, good morning. Good morning, Your Honors, and may it please the Court, John Pelletieri on behalf of the United States. I'd like to start with the Brady claim. I think it's helpful to understand the timeline that occurred here. The conduct at issue in this case, the investigation occurred from 2007 and it ended in May 2008. Then after it ended, Beckworth or Bones went to Lubbock, Texas, and then Dallas and was involved in an ATF, undercover ATF investigation there that lasted no later than June 2009. So at the time that investigation was occurring, the outrageous government conduct motion in this case was being litigated. There was a hearing that was occurring before the magistrate judge. And then the magistrate judge in October 2009 issued an opinion denying the or recommending denial of the motion for dismissal. Then in December 2009, the DABNY, one of the defendants in the Dallas, Texas case, filed a motion for dismissal based on outrageous government conduct alleging in a pleading, that Bones Beckworth had caused him to sell drugs to the undercover agents in Dallas. That was in December 2009. Then the trial in this case occurred in March and April 2010, a few months after that motion was filed. Then after the trial in July or August, there was contact between the defense counsel in Texas and the defense counsel in this case. And that's when things started heating up, apparently started heating up in Texas with regard to the outrageous government conduct motion in Texas. Bones testified in your case, right? Yes, he did. No, he testified for the defense. The defense called him as a witness. He was not a government witness. So the defense called him in support of their case. And then he goes to Texas and is asked, do you ever put yourself in federal court? He takes the fifth. That was in May 2011. So to get back to the timeline, in the summer, July, August 2010, is when things started to heat up in the outrageous government conduct motion in Texas. And the government conducted an investigation there. We gave polygraphs to Bones and to Tilly and to Dabney. The import of my question is, after he testified in Nevada, he takes the fifth in Texas about whether he put himself in federal court. Yes, so May 2011, a year after the, more than a year after the trial, what happened was, this was in a, in one of the Lewis resentencing hearing. The judge wanted to hear from Beckworth. And he was appointed a counsel in the morning, right before the hearing. And he was advised to plead the fifth. And that's what he did. I don't. Why isn't that newly discovered evidence? I'm not sure it wouldn't, I don't think it would be, it would, could be taken into account as newly discovered evidence. But it's not material. So to back up and think more broadly about this, these allegations regarding Bones, even if you take all the evidence, all the evidence in the Texas case, and our position is that only the Dabney motion that was filed in December 2009 could feasibly be Brady material. But even if you take all of the evidence in the Texas case as newly discovered evidence, and then talk about materiality with respect to all of it, it's not material. And again, materiality with respect to a newly discovered evidence is a higher standard than the materiality with respect to Brady. The defendants bear the burden of proving that it would probably result in a different result at trial. So taking into account all of the evidence in the Texas case is simply not material because it does not change in any material way the government, excuse me, the jury's determination of predisposition with respect to these defendants. And to go back to the evidence at trial, the evidence showed that the government agents came into contact with these defendants through a gang member, Paul, I think Ashley was his name. They asked him to get some people together at a bar to show that they were protecting the ATF agents who were kind of posing as kind of bad guys, bikers. And so this Ashley, a member of the 28th Street Gang, got Sang-Lang. Sang-Lang brought along Patton. And at that meeting, at that bar, Sang-Lang told the agents at the get-go, I'm a member of the, I'm a blood or a crip, I forget which one, and I have a source of drugs in Los Angeles. And then Patton sold the gun to the agents on that first night. Through the back door, through Bones, the agents got out word that they were looking for guns, and they purchased a gun from Patton that night. Then the agents purchased additional guns. All this is caught on video showing the guns sales. And during these gun sales, Patton and Sang-Lang are saying, we have sources of guns in Atlanta. We can get you fully automatic weapons. We have this source in Atlanta, and he delivers drugs to us. And he can deliver guns and drugs when he delivers the drugs up to Las Vegas. They also talk about how they can get, how they're involved in, and they're involved in drug trafficking. And they talk to, and they push the agents to be a purchaser of drugs, large quantities of drugs from the defendants. In fact, the ATF agents had to push off the defendants in terms of making these purchases because they had to get approval from the ATF to make such large purchases. They didn't have that approval at the get-go. Eventually, they were able to get that approval, and they made the large purchases. At the pushing, at the urging of the defendants in this case, the defendants talked about how they have sources of drugs in Los Angeles. A cousin was a source of drugs. Patton talked about how he has a source in the Florencia 47 gang. He'd been into a house where methamphetamine had been purchased. He could get drugs from that gang. And all of this is caught, and these transactions on video show the defendants urging the agents to make these purchases. All this goes to predisposition. Speaking of video, what's the story on destroying a bunch of recordings? The testimony at the trial, the testimony in the hearing and at trial is that the agents, what happened was there were recorders, there were cameras in the shop and outside the shop. And within the shop, the cameras could, there were DVD players that could, you could put in a DVD and record from those videos. Now, there was also a 20, there was a feed that went to the, to a nearby house where ATF agents could look, can monitor for the safety of the ATF agents in the tattoo shop. And, but there were also DVD players where the agents would put in a DVD, press record, and they would record for six, I think six hours at a time. And they would put them in pretty much when they entered the shop. And then there was sound. This is a one write kind of thing. You write it once and then keep the DVD. See, it records. Don't record over it. No, you record six hours and then you can't, that's it, it's recorded, the six hours. And the testimony was that Agent Gomez, who was basically the lead agent in this case, would, they would put the DVDs in, press record when they came in. And they would, and when there were transactions where the, where the agents were present, talking, either talking about the robbery or the guns or the drugs, or making a transaction, and Agent Gomez knew that that had been recorded, he would save that, and they didn't record, they didn't record, they didn't, and he didn't keep the recordings that was just of the agents where nothing happened, where they, he mentioned that- What do you say there's nothing happened? They say it would have, it would have exculpated them. Well, again, they're saying that the, that the recordings where the agents were not present would have been exculpatory. But where the agents were present and they were just eating pizza or something, they got rid of those, and they got rid of everything where the agents were not present. And they didn't make, they didn't look in, they didn't review any of the tapes where the agents were not present and they didn't know it was on it. And so that was the practice they followed. Now, with hindsight, it's not something I, they would be advised to do. It may not be the most, the wisest practice, but it was the practice they followed. And there was no bad faith in that practice. The standard here is whether at the time the evidence was discarded or destroyed, there was, the material had apparent exculpatory value, so that the destruction of that is in bad faith. There was no apparent exculpatory value of the DVDs that Agent Gomez got rid of and discarded. It's somewhat suspicious that the tapes of the informant's parlor, tattoo parlor, bay as they called it, was destroyed. Doesn't that raise a red flag? The magistrate judge even pointed out that, you know, that wasn't the best of conduct, even though he said it wasn't bad faith. It wasn't the wisest course of maintaining the evidence in this case. But again, there was nothing that, there was no apparent exculpatory value at the time that they got rid of it. The agents are making that decision. They're making the decision. Now again, it's not that they couldn't have, that these tapes couldn't have been looked at, they couldn't have been reviewed, and perhaps there may have been something there. That's not the standard. It's not that maybe there was something there. Case where you probably knew from the beginning there was going to be raised, the agents at least, that there was going to be an enchantment defense growing out of this reverse thing and use of the CI. That seems rather important to me. Well, what the agents' view was is that they were recording all of the interactions with these defendants showing all of this discussion about sources, showing all of the details of these transactions. And at the point, it wasn't in their mind that these tapes showed anything that would be of apparent exculpatory value. Again, I wouldn't urge them to do that. They should have kept the tapes just out of a matter of prudence. But in terms of the apparent exculpatory value of the material at that time, it wasn't present. Again, for example, in the Supreme Court cases that flesh out this standard, you have, for example, the Youngblood case where there was blood and semen evidence that was not preserved. Of course, tests could have been performed on that. And obviously, there may have been information. But there was no bad faith because there was no apparent exculpatory value at the time they were preserved. Similarly, in the Trombetta case, it was a breath sample which had been, a test had been performed on, and the breath sample was not saved. And again, obviously, additional tests by the defense could have been performed. But at the time that it wasn't preserved, there was no apparent exculpatory value. There was even less apparent exculpatory value in this case, where there was no, and even if it's assumed, even if it's assumed that the tapes, as Patton suggests in his testimony, had showed that they, that the, that Sang-Lang and Patton gave money to Bones outside the presence of the, outside the presence of the ATF agents, even if that's assumed to be the case, it wouldn't have been, it wouldn't have changed the calculus of the predisposition determination by the jury here. It would have been, it would have been relevant to inducement, because it's an inducement to, to perhaps, it supports the notion that he gave them the guns and drugs. But predisposition is separate than inducement. It shows the character of the defendant. You know, the, the, the factors that are relevant are whether the defendant demonstrated a reluctance to commit defense. There's no reluctance here. Even if you assume that what they did was sell these guns and drugs on behalf of Bones, there's no suggestion that they were reluctant to do it. There's no suggestion that they that they were forced to do it. There's no suggestion that that somehow they were tricked, you know, that they were, that they somehow were pushed to do it. They did it because Jones said, hey, I can get some more money if you sell it to the, to the ATF agents. Well, and then they did that, and that is, that's, that's proof of predisposition, showing that they're willing to go and make these transactions, even on behalf of someone else. You know, whether the, the, the defendant's character and reputation, if you saw all these, these, these discussions of the sources. Again, that, that, the, if you, even if you assume that the evidence would have shown that, it doesn't affect the predisposition calculus. So it's not material under Brady for those, or, or not material under a newly discovered evidence standard for those purposes. I can discuss the addition, the other, I'd be happy to discuss any, or answer the court's questions with respect to the other issues. I don't have any. Judge? I have no questions. Commissioner Mill, are you? I need to have a little rest on this brief. Thank you. Thank you very much. Ms. Rasmussen, I think back to, back to you. I really just have a couple of comments, and then I'll yield to Mr. Kennedy. First of all, we are not arguing in response to the government that the video that would have had the agents in it was meaningless. I think quite the contrary. I think that would have shown the agents grooming our clients, and that, that would have been part of the entrapment. So it's not just these videos where the agents left and then our clients gave Bones the money that shows the complete cycle of Bones setting this whole thing up, it's all of it. Now, with regard to the government's basically said that there, there was no, no showing of bad faith on the part of the government. What you had at the conclusion of the evidentiary hearing and also in trial was DeAndre Patton's unrebutted testimony that this is what happened in the tattoo bay with Bones. And whether or not the, the government acted in bad faith, once, once you, we then get into a posture of this motion for new trial with all of these other issues that come up with Bones, it affects everything, it goes back to the evidentiary hearing. Now we're back, and, and the government's ana, the court's analysis of whether the government acted in bad faith is erroneous because they knew that there were problems with Bones. They knew that he was using drugs while he was an informant. Their test, government's testimony is, well, we counseled him. They knew there were problems. So for them not to look at any of the video when they're not there and see what Bones is actually doing was improper. Counsel, counsel, Judge Gould. So let me, let's say, let's assume for a minute that Bones is using drugs. He's frequently taking drugs under the watchful eye of video when agents aren't there or whatever. Let's assume that. How does that go to disposition? It doesn't go to disposition. How about it go to, so it would not, it would not affect the entrapment defense? It, it, it could, it, what it shows the ATF is that they have an unruly informant. They have an informant who's out of line. And again, this goes back to our ability to put on extra testimony. So it goes to outrageous conduct, warrants a due process. Yes. Dismissal. And then when the government testifies that they don't think there would have been anything important on those videos, so they threw them out, it's disingenuous. Because they knew that there were problems with Bones. They knew that, that they should look, they should have looked at them, frankly. But, you know, we can't charge them with not looking at them. We can say you threw them out. You threw them out and we believe they were important. So for that, it, it just goes, this is, this is why the government is disingenuous in making the argument that they had no way of knowing that there was anything important on those videos that they simply discarded. That, that, you know, they couldn't be reused. They would have fit in a shoebox. And there was no reason for them to throw them out. And that's why it was error not to give us the instruction. I've got two minutes left and I'd like if the Court could hear from Mr. Kennedy again. Mr. Kennedy, back to you. Thank you, Mr. Rasmussen. The government argues against the jury instruction in suggesting that Profitt has no basis in predisposition. At EOR 4369, one of the five factors in the Ninth Circuit instruction, which was jury instruction number 18, is whether the defendant engaged in criminal activity for Profitt. If the evidence is that Bones is making all the profit, that would go to predisposition. With respect to the nature of the inducement or persuasion supplied by the government, that is factor number five for predisposition. If Bones is the one doing the persuasion and the inducement, and he testifies later that he perjured himself, or he's taking the fifth, that would be important. Whether the government initially made suggestion of criminal activity, that is Bones as well. So the error in each of the two district court decisions was they didn't analyze that aspect of the case with respect to predisposition. And with the destruction of the tapes, Bones was an informant who, prior to signing up, committed a strong arm robbery where he put a firearm to a guy's head, withheld that from the agents. They found out about it later. So they were on notice that they had a guy who lied to them from Jump Street. They went and got him probation. Then they have Dallas, Lubbock, and Las Vegas evidence that he's creating crime. That came out at the trial, didn't it, the business with the robbery? Yes, it did. But it goes to the bad faith of these agents. They knew that everything on those tapes was going to be relevant. The government can't just say it's not relevant. With respect to trials that I've done, the evidence that they kept that they didn't think was relevant, oftentimes is the evidence that leads to acquitment. Thank you. All righty. Thank you, Mr. Kennedy, Mr. Rasmussen, Mr. Brooklier, Mr. McChurry. Thank you very much. Cases just argued are submitted. We'll stand and recess. We'll reconvene in the conference room at 3 o'clock.
judges: Lemelle, Silverman, Gould